# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In Re:                                          Chapter 7

                                                Case No. 19-54793

BRIAN EARL SYLVESTER                            Hon. Lisa S. Gretchko

_____/


MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

                                                Adv. Pro. No. 21-04063-lsg
                    Plaintiff,                  Hon. Lisa S. Gretchko

v.

BRIAN EARL SYLVESTER,

                    Defendant.

_____/


## OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### Introduction

Brian Earl Sylvester ("Sylvester" or "Debtor") is the Debtor in this Chapter 7

bankruptcy case. The Michigan Department of Health and Human Services ("HHS")

filed this adversary proceeding against him under 11 U.S.C. §§ 523(a)(3)(B) and

523(a)(2)(A) seeking a determination of non-dischargeability of debt.

1

On January 14, 2022, HHS filed a Motion for Summary Judgment (the "Motion"). Sylvester responded to the Motion, HHS filed a reply and the Court held oral argument on the Motion. The Court has reviewed the complaint and the answer, the Motion and Sylvester's response, HHS' reply and all briefs (including all affidavits and other exhibits) filed in connection with the Motion. The Court has also reviewed discovery on file in this adversary proceeding, plus pertinent filings in the Debtor's main bankruptcy case and certain publicly filed documents, and has considered all statements made during oral argument on the Motion. After carefully considering the record, the Court grants the Motion in part and denies it in part; pursuant to F.R.Bankr.P. 7056, this opinion explains the Court's reasons for doing so.

## Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a), 157(b) and Local Rule 83.50(a) (E.D. Mich.). HHS' non-dischargeability of debt claims under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(3)(B) are core proceedings under 28 U.S.C. § 157(b)(2)(I).

## Background Facts

HHS is an agency of the State of Michigan. Among other duties, HHS is the lead agency for administering Medicaid's Home Help Program pursuant to M.C.L. 400.1 *et seq.* ("Home Help Program").

Sylvester worked as a home health caregiver. On or about September 15, 2015, Sylvester formed New Horizon Community Health Group ("New Horizon") as a sole proprietorship with himself as the owner. On that same day, Sylvester sent a letter of intent to HHS, bearing his hand-written signature, requesting to enroll New Horizon as a Home Help Agency ("Letter of Intent").

Once enrolled in the Home Help Program, a Home Help Agency is considered the "provider of record" and is paid the "Agency Rate", which is higher than the rate paid to individual caregivers. In exchange for receiving the higher "Agency Rate", a Home Help Agency is required to employ the caregivers and make sure they are enrolled in the Community Health Automated Medicaid Processing System ("CHAMPS") so that HHS can perform the criminal background check on those caregivers.

A Home Help Agency also has a statutory duty to ensure that its caregiver employees comply with the requirements of the Home Help Program before billing Medicaid for reimbursement. Pursuant to M.C.L. § 400.111b(17), the Home Help Agency (as the provider of record): (1) must certify that a claim for payment is true, accurate, prepared with the knowledge and consent of the provider, and does not contain untrue, misleading, or deceptive information, and (2) is responsible for the ongoing supervision of an agent, officer or employee who prepares or submits the provider's claims.

On November 2, 2015, HHS issued a letter addressed to New Horizon (and directed to Sylvester) informing him that New Horizon had met the definition of a Home Help Agency effective September 15, 2015—which is the date of Sylvester's Letter of Intent. This letter also informed Sylvester that "Policy bulletins and other Home Help Information is available at www.Michigan.gov.HomeHelp."

There appears to be a dispute as to whether Sylvester "electronically signed" Exhibits 2 and 3 attached to the Affidavit of HHS employee Michelle Martin (the "Martin Affidavit") or whether Sylvester authorized someone to "electronically sign" on his behalf. Paragraph 10 of the Martin Affidavit describes Exhibits 2 and 3 as a computer-generated version of New Horizon's enrollment agreement and New Horizon's updated provider agreement, respectively. Sylvester argues that he lacked computer literacy.

However, it is undisputed that Sylvester's hand-written signature appears on: (1) the Letter of Intent and (2) a Home Help Provider Agreement (with a hand-written date of "3-28-16") naming New Horizon as the Agency Provider ("Hand-Signed Provider Agreement"). The Hand-Signed Provider Agreement contains, among other things, the following statements (collectively, the "Statements"):

∗In order to receive payment, I agree to keep and submit to DCH, DHS or their designee, any and all records necessary to disclose the extent of services provided to the client.

4

∗Upon request, I agree to provide DCH, DHS or their designee, any information regarding services or purchases for which payment was made.

∗I agree to cooperate with DCH, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.

∗I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

∗By signing the Provider Agreement, I acknowledge that I have read the Provider Agreement, and the included instructions. I agree to fully comply with all program requirements.[1]

The record does not include the instructions that Sylvester acknowledged reading.

The Martin Affidavit (at ¶ 11) confirms that if Sylvester had not submitted a signed provider agreement, New Horizon would not have been approved as a Home Help Agency. While the Hand-Signed Provider Agreement constitutes a provider agreement, it is not yet clear whether Sylvester electronically signed (or authorized the electronic signing of) other enrollment agreements or other provider agreements for New Horizon.

Despite Sylvester's statement in the Hand-Signed Provider Agreement that he had read the provider agreement and the included instructions and would fully

---

[1] This is the last statement before Sylvester's hand-written signature on the form.

comply with all program requirements, based on Sylvester's admissions during his deposition in this case, it is undisputed that: (1) from 2016-2019, he did not read or review any of the provider bulletins that were issued by HHS or discuss them with Ms. Twilley[2] (Sylvester Deposition, pages 21-22), (2) New Horizon did not review provider logs to verify their accuracy before they were submitted for payment (Sylvester Deposition, pages 35-37), (3) Sylvester could not recall when he became aware that caregivers needed to be enrolled in CHAMPS, and he never asked a caregiver if he or she was enrolled in CHAMPS (Sylvester Deposition, pages 32-33), (4) he did not provide training to caregivers on how to complete the provider logs (Sylvester Deposition, page 36), and (5) when New Horizon received provider logs, he did not keep them for 7 years as MCL 400.111b (6) and (8) require (Sylvester Deposition, page 38).

It is also undisputed that caregiver employees of New Horizon generally submitted provider logs directly to the responsible person at the county level as claims for payment and that HHS paid New Horizon the Agency Rate based on those caregiver employees' direct submissions of provider logs. During oral argument on the Motion, HHS' counsel explained that, until sometime in 2019, the Home Help program allowed for provider logs to form the basis for payment and permitted direct

---

[2] Sylvester hired Ms. Twilley in 2016 to work in the office of New Horizon. Sylvester Deposition, pages 18-19.

submission of provider logs by caregiver employees, rather than requiring Home Help Agencies to submit an invoice.

According to the affidavit of HHS employee Nicole Roszkowski (the "Roszkowski Affidavit" at ¶15), New Horizon began receiving payments from HHS on or around December of 2015.

According to ¶11 of the Roszkowski Affidavit, at some point after receiving complaints from departmental employees regarding New Horizon caregiver employees who were not enrolled in CHAMPS, HHS conducted a post-payment review of New Horizon. Sylvester and New Horizon did not have documentation supporting who (i.e., which caregiver employee) provided which services for clients of New Horizon, but New Horizon offered to provide payroll records. HHS granted New Horizon an extension of time, and New Horizon provided HHS with some information. After reviewing the information provided by New Horizon along with provider logs, HHS determined that New Horizon had been overpaid $1,951,973.43 ("Initial Overpayment Amount") for the period from July 15, 2016 through May 31, 2019 ("Overpayment Period") consisting of: (i) 1,163 claims for which a caregiver was not enrolled in CHAMPS, (ii) 2,195 claims for which New Horizon was unable to identify the caregiver who rendered the services, (iii) 15 claims for services reported to have been provided by caregiver Debra Taylor after her death, and (iv) 11 claims where the beneficiary was in-patient at a hospital or nursing facility and,

therefore, would not have been eligible to receive home health services. (Roszkowski Affidavit, at ¶¶ 25-27).

New Horizon was a sole proprietorship for the entire Overpayment Period. According to the Michigan Department of Licensing and Regulation, New Horizon became a domestic limited liability company on September 4, 2019.

On or about September 24, 2019, HHS sent Sylvester a Notice of Preliminary Findings informing him of the $1,951,973.43 Initial Overpayment Amount.

On October 17, 2019, Sylvester filed Chapter 7 bankruptcy *pro se.* Sylvester later obtained bankruptcy counsel who filed an appearance in his Chapter 7 bankruptcy case on December 10, 2019. Sylvester did not list HHS in his original bankruptcy schedules.

The deadline for non-dischargeability complaints in Sylvester's bankruptcy was January 21, 2020. On June 11, 2020—months after that deadline expired— Sylvester filed amended schedules E/F ("Amended Schedules E/F"; ECF No. 52) and listed HHS as an unsecured nonpriority creditor in the amount of $1,951,973.43—i.e., the Initial Overpayment Amount. He described the HHS claim as an "overpayment" and, importantly, Sylvester did not list HHS' claim as "disputed", "contingent", or "unliquidated". Pursuant to F.R.Bankr.P. 1008, Sylvester verified his Amended Schedules E/F as follows (in bold letters):

**AFFIRMATION OF DEBTOR(S); I declare under penalty of perjury that I have read this cover sheet and the attached**

8

> **schedules, lists, statements, etc., and that they are true and correct
> to the best of my knowledge, information and belief.**

See Case No. 19-54793, ECF No. 52, page 4.

On February 23, 2021, HHS filed its complaint in this adversary proceeding alleging that the Initial Overpayment Amount is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(3)(B). During discovery in this adversary proceeding, HHS received and reviewed additional provider logs that were produced by Sylvester (or his counsel) and determined that there were: (i) 1,132 claims for which a caregiver was not enrolled in CHAMPS, (which is 31 claims fewer than the original figure of 1,163 such claims), and (ii) 1,908 claims for which New Horizon was unable to identify the caregiver who rendered the services (which is 287 claims fewer than the original figure of 2,195 such claims). Consequently, HHS reduced the amount of its asserted overpayment from the Original Overpayment Amount of $1,951,973.43 to $1,764,105.72 ("Revised Overpayment Amount")—which is a $187,867.71 reduction in Sylvester's favor. (See Roszkowski Affidavit, at ¶ 41).[3]

---

[3] During oral argument, counsel for HHS indicated that HHS would be willing to consider further reductions in the claimed overpayment amount provided that Sylvester could submit records justifying the reductions. For this reason and the fact that the Court is not granting summary judgment in full, the Court is not ruling on the issue of whether the administrative ruling constitutes a judgment on the amount of damages.

HHS' Motion seeks summary judgment regarding the Revised Overpayment Amount.

### Summary Judgment Standard and Burden of Proof

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "properly address another party's assertion of fact as required by Rule 56(c)." Fed.R.Civ.P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, the court may grant summary judgment only if the evidence is so one-sided that a reasonable factfinder could not find for the opposing party. *See, Anderson,* 477 U.S. at 248–50; *Street v. J.C. Bradford & Co.,* 866 F.2d 1472, 1478–80 (6th Cir. 1989).

The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is "the ordinary preponderance of the evidence standard." *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Rembert v. AT & T Universal*

*Card Services, Inc. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998). "In order to except a debt from discharge, a creditor must prove each of [the] elements [of non-dischargeability] by a preponderance of the evidence." *In re Rembert,* 141 F. 3d at 281 (citations omitted). "Further, exceptions to discharge are to be strictly construed against the creditor[,]" and instead "are to be strictly construed in favor of the debtor." *United States v. Hindenlang (In re Hindenlang),* 164 F.3d 1029, 1034 (6th Cir. 1999) (citations omitted).

HHS' Motion seeks a determination of non-dischargeability pursuant to §§ 523(a)(3)(B) and 523(a)(2)(A) of the Bankruptcy Code. Accordingly, the Court must determine if HHS is entitled to summary judgment under each of the foregoing statutes.

### Non-Dischargeability Under 11 U.S.C. § 523(a)(3)(B)

This adversary proceeding was filed on February 23, 2021—more than one year after the January 21, 2020 deadline for non-dischargeability complaints in Sylvester's bankruptcy case. In order for HHS to prevail on its Motion, HHS must prove that there is no genuine issue of material fact with respect to the elements of 11 U.S.C. § 523(a)(3)(B).

Bankruptcy Code Section 523(a)(3) states that a discharge under section 727:

…does not discharge an individual debtor from any debt—…

11

**(3)** neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

    **(A)** if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

    **(B)** if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request[.]

It is undisputed that Sylvester did not list HHS in his original bankruptcy schedules (*see* Defendant's Answer to Complaint at ¶9). The Court's records in Sylvester's main bankruptcy case demonstrate that he did not file his Amended Schedules E/F listing HHS as a creditor until June 11, 2020, several months after the expiration of the January 21, 2020 deadline for non-dischargeability complaints under 11 U.S.C. § 523(a)(2), (4), or (6).

May 31, 2022 was recently established as the deadline for filing proofs of claim in Sylvester's bankruptcy case (due to the Trustee's recovery of assets for the estate). On May 16, 2022, HHS filed a proof of claim for $1,764,105.72. Section 523(a)(3)(B) still exists as a basis for a judgment of non-dischargeability to the extent of any claim established under 11 U.S.C. § 523(a)(2), (4), or (6), because § 523(a)(3)(B) is phrased conjunctively. However, as explained below, HHS has not, at this point, demonstrated entitlement to non-dischargeability under § 523(a)(2).

12

Accordingly, HHS' Motion for summary judgment under 523(a)(3)(B) cannot be granted.

## Non-Dischargeability Under 11 U.S.C. § 523(a)(2)(A)

In order for HHS to prevail on its Motion with respect to its claim under 11 U.S.C. § 523(a)(2)(A), HHS must prove that there is no genuine issue of material fact with respect to the elements of that cause of action, namely:

(1) the debtor obtained money, property, services, or credit;

(2) through a material misrepresentation;

(3) that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

(4) the debtor intended to deceive the creditor;

(5) the creditor justifiably relied on the false representation; and

(6) its reliance was the proximate cause of loss.

*Rembert v. AT & T Universal Card Services, Inc. (In re Rembert),* 141 F.3d 277, 280–81 (6th Cir. 1998) (citation omitted). HHS has proven that there is no genuine issue of material fact with respect to one of the foregoing elements but not with respect to the remaining elements.

## Did Sylvester Obtain Money, Property, Services or Credit?

As to the first element of this § 523(a)(2) action, there is no genuine issue of material fact that Sylvester obtained money. Although HHS' payments were issued

13

to New Horizon, at all times during the Overpayment Period (i.e., from July 15, 2016 through May 31, 2019 (Roszkowski Affidavit, at ¶ 27)) New Horizon was a sole proprietorship, and Sylvester was the sole proprietor. It is axiomatic that a sole proprietorship does not have a legal existence apart from its owner. According to *Black's Law Dictionary*, the sole proprietor owns all the assets of the business conducted as a sole proprietorship (and is responsible for all liabilities of a business operated as a sole proprietorship). "Because the business is a sole proprietorship, it does not have a legal existence apart from its owner." *Harvey v. Allstate Ins. Co.*, No. 258695, 2006 WL 707789, at *1 (Mich. Ct. App. Mar. 21, 2006). Thus, payments to New Horizon constituted payments to Sylvester as its sole proprietor.

Courts construing this first element of § 523(a)(2) focus on whether the debtor obtained a benefit from his fraud. In *In re Leonard,* 644 Fed.App'x. 612, 619 (6th Cir. 2016), the Sixth Circuit stated that "[i]t is sufficient to 'show that the debtor ... indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation.'" (quoting *In re Brady*, 101 F.3d 1165, 1172 (6th Cir.1996)).

HHS' payments to New Horizon constituted Sylvester obtaining a benefit for purposes of 11 U.S.C. § 523(a)(2). New Horizon was a sole proprietorship throughout the Overpayment Period, and Sylvester was the sole proprietor, so money obtained by New Horizon constitutes money obtained by Sylvester for purposes of § 523(a)(2).

14

Sylvester argues that HHS' Motion should be denied because HHS has failed to show that the money received by New Horizon was not used to pay all of its employees or that it disproportionately benefitted Sylvester personally. However, HHS is not required to make such a showing.

Instead, § 523(a)(2) only requires that HHS prove that Sylvester obtained money from HHS. That element is established. HHS' payments to New Horizon benefitted Sylvester—the sole proprietor—without any "attenuation" or corporate intermediary. Moreover, it is undisputed that HHS paid New Horizon at the "Agency Rate", which is higher than the rate paid to individual caregivers. Even if New Horizon did pay all of its caregiver employees for the services provided, Sylvester still obtained money from HHS and, indeed, obtained the marginal benefit from the higher Agency Rate. HHS has satisfied the first element of 11 U.S.C. § 523(a)(2)(A).

## Was There a Material Misrepresentation, False Pretenses or Actual Fraud?

The second element of a § 523(a)(2)(A) action requires HHS to prove a material misrepresentation, false pretenses, or actual fraud.

HHS describes the material misrepresentations as the (i) 1,132 claims for which a caregiver was not enrolled in CHAMPS, (ii) 1,908 claims for which New Horizon was unable to identify the caregiver who rendered the services, (iii) 15 claims for services reported to have been provided by caregiver Debra Taylor after her death, and (iv) 11 claims where the beneficiary was in-patient at a hospital or

15

nursing facility and, therefore, would not have been eligible to receive home health services. (ECF No. 46, page 3, at ¶7).

However, Sylvester asserts that the caregiver employees generally submitted their provider logs directly and, consequently, any misstatements in those submissions cannot be attributed to him for purposes of this non-dischargeability action.

For purposes of this Motion, the Court must view the evidence in the light most favorable to the non-moving party. To the extent that HHS seeks summary judgment against Sylvester for making any misstatements in those provider logs that caregiver employees (other than he) submitted directly for payment, this Court cannot grant the Motion because there is a genuine issue of material fact.

While the Hand-Signed Provider Agreement contains the Statements (including the acknowledgment that he had read the provider agreement and the included instructions, and his agreement to fully comply with all program requirements), the record is silent as to whether Sylvester read the instructions attached to the Hand-Signed Provider Agreement and the content of those instructions. So, it is impossible at this point to know what was in the instructions that Sylvester acknowledged that he had read.

Consequently, there is a genuine issue of material fact whether the Statements in the Hand-Signed Provider Agreement constitute misrepresentations. To the extent

that HHS argues that New Horizon's computer-generated enrollment agreement contained misrepresentations, there is also a genuine issue as to whether Sylvester signed or read it and its updated provider agreement (or authorized someone to electronically sign on his behalf).

**Did Defendant Make Misrepresentations Knowing They Were False or with Gross Recklessness as to Their Truth?**

The third element of a § 523(a)(2)(A) action requires HHS to prove that when Sylvester made misrepresentations, he knew they were false or made them with gross recklessness as to their truth.

It is undisputed that Sylvester was not complying with certain program requirements during the Overpayment Period. Based on Sylvester's admissions at, *inter alia,* pages 21-38 of his September 9, 2021 deposition: (i) he was not reviewing provider logs to verify their accuracy before they were submitted for payment, (ii) he was not training caregivers on how to complete the provider logs, (iii) he was not determining whether a caregiver was enrolled in CHAMPS, and (iv) he was not keeping provider logs. However, that non-compliance does not necessarily result in non-dischargeable debt under § 523(a)(2)(A).

At this summary judgment stage, the Court must view the evidence in the light most favorable to Sylvester. It is not clear from the record whether the Statements in the Hand-Signed Provider Agreement constitute misrepresentations. Sylvester argues that he was an unsophisticated businessman and thought he was complying

17

with the requirements of the Home Health Program (*see* Sylvester's Brief, ECF No. 55, page 9). Consequently, the Court cannot determine whether Sylvester made misrepresentations knowing them to be false or with gross recklessness as to their truth.

Accordingly, the Court denies HHS' summary judgment motion on this element of § 523(a)(2)(A).

## **Intent to Deceive**

The fourth element of a § 523(a)(2)(A) action requires HHS to prove that Sylvester intended to deceive HHS. According to *In re Rembert,* 141 F. 3d 277, 281 (6th Cir. 1998), the proper inquiry is whether Sylvester subjectively intended to deceive HHS. The Court is to look at the totality of the circumstances in making this determination. *In re Copeland*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003). Again, in the context of HHS' Motion, all evidence must be viewed in a light most favorable to Sylvester.

Sylvester argues that he did not intend to deceive HHS. He argues that because HHS permitted caregiver employees to submit their claims directly (rather than through New Horizon) and because HHS paid New Horizon on claims submitted directly by its caregiver employees, then Sylvester cannot be held responsible for any fraudulent claims submitted by New Horizon's caregiver employees.

HHS argues that the sheer volume of claims that "failed" HHS' inspection demonstrates Sylvester's intent to deceive.

The Court observes that both sides in this case fail to address whether Sylvester had the requisite intent to deceive as of March 28, 2016, when he made the Statements contained in the Hand-Signed Provider Agreement or at the time of other alleged misrepresentations.

On the facts of this case and based on the record at this point, the Court needs to hear testimony in order to determine the "intent to deceive" element of §523(a)(2)(A); consequently, summary judgment on this element is denied.

## Did HHS Justifiably Rely on Sylvester's False Representations?

The fifth element of a § 523(a)(2)(A) action is that the creditor must have justifiably relied on the false representations. *In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998). "This element has two components. First, there must be a demonstration that the creditor actually relied on the false representation and, second, there must be a demonstration that such reliance was justifiable." *In re Hermoyian*, 466 B.R. 348, 368 (Bankr. E.D. Mich. 2012).

As discussed above, there is a genuine issue of material fact as to whether Sylvester made false representations. HHS claims actual reliance on Sylvester's statements in two electronic provider agreements through the Martin Affidavit,

paragraph 11 of which states that HHS never would have approved New Horizon for the Home Help Program had Sylvester not signed a provider agreement.

Sylvester, however, argues that HHS' reliance was not justifiable.

The Supreme Court has held that excepting a debt from discharge under § 523(a)(2)(A) requires the creditor to establish that its reliance was "justifiable", which is a lower standard than "reasonable" reliance. *See Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The United States Supreme Court explained justifiable reliance as follows:

> [A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation.... [A]lthough the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all case. Justifiability is not without some limits, however.... [A] person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation...
>
> ... [I]t is only where, under the circumstances, the facts would be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.

*Id.* at 70–71 (internal quotation marks and citations omitted).

Sylvester argues that HHS' reliance was not justifiable because even "[f]rom a cursory glance" HHS should have realized that the provider logs were not being submitted by Sylvester or by an authorized representative of New Horizon. (ECF

No. 55, p. 18). Sylvester blames the HHS system for directing Home Help Agencies like New Horizon to use forms that (in Sylvester's opinion) propagate fraud.

In response, HHS argues that its reliance was justified because of the statutory requirements contained in MCL 400.111b(17) and the systems that existed at that point in time to pay Home Help Agencies. However, at oral argument on the Motion, HHS noted that (until sometime in 2019) the Home Help Program allowed for provider logs to form the basis for payment, and that it permitted direct submission of provider logs from caregiver employees, rather than requiring Home Help Agencies to submit an invoice to HHS. (Both parties acknowledge that HHS' system has now changed.)

The Court finds that there is a genuine issue of material fact as to whether HHS' reliance on Sylvester's Statements in the Hand-Signed Provider Agreement was justified. The Roszkowski Affidavit indicates (at ¶11) that she was the agent assigned to investigate New Horizon ". . . after the Department received complaints from departmental employees regarding caregivers employed by New Horizon that were not enrolled in the Department's CHAMPS." And, at ¶24, the Roszkowski Affidavit states that "[d]uring this period, Home Help Agencies typically submitted provider logs demonstrating what services were provided, and by whom." However, the record is silent as to the details and timing of the complaints from HHS

departmental employees, and how unusual it was for caregiver employees to submit provider logs (rather than have New Horizon submit them or an invoice).

Without additional facts in the record, the Court is unable to evaluate whether HHS' reliance on Sylvester's alleged misrepresentations in the Hand-Signed Provider Agreement was justified or whether the alleged falsity of Sylvester's Statements therein should have been patent to HHS. Consequently, HHS has failed to satisfy this element of § 523(a)(2)(A).

## Was HHS' Justifiable Reliance the Proximate Cause of Loss?

This last element of § 523(a)(2)(A) is predicated on a finding of justifiable reliance. Because the record is insufficient for this Court to determine that HHS was justified in relying on Sylvester's misrepresentations in the Hand-Signed Provider Agreement, there is an insufficient record from which this Court can determine if HHS has satisfied this last element of § 523(a)(2)(A).

### Conclusion

In conclusion, the Court finds that there is no genuine issue of material fact that HHS has established that Sylvester obtained money.

However, the Court finds that genuine issues of material fact exist with respect to the remaining elements of 11 U.S.C. § 523(a)(2)(A). And, in the context of this case, § 523(a)(3)(B) only provides a basis for non-dischargeability to the extent of

22

non-dischargeability under § 523(a)(2)(A). Consequently, summary judgment on HHS' invocation of 11 U.S.C. § 523(a)(3)(B) is also denied.

In conclusion, HHS' Motion is granted in part and denied in part. The Court will issue a separate order setting a status conference to discuss scheduling of the joint final pretrial conference and trial on the issues that remain for trial.

**Signed on August 4, 2022**



/s/ Lisa S. Gretchko
Lisa S. Gretchko
United States Bankruptcy Judge